**Nathan GARDELS, Appellant,**

v.

**CENTRAL INTELLIGENCE AGENCY.**

**No. 81–1567.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 26, 1982.

Decided Sept. 28, 1982.

Susan W. Shaffer, Washington, D. C., with whom Mark H. Lynch, Washington, D. C., was on the brief, for appellant.

Daniel J. Metcalfe, Atty., Dept. of Justice, Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellee.

Before EDWARDS, Circuit Judge, McGOWAN, Senior Circuit Judge, and DAVIS,* Judge, United States Court of Claims.

Opinion for the Court filed by Judge DAVIS.

DAVIS, Judge:

We have to decide whether the District Court correctly upheld on summary judgment, under the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(3), the Central Intelligence Agency's refusal to confirm or deny the existence of records pertaining to covert contacts for foreign intelligence purposes between the Agency and individuals at a specific university in the United States. Our answer is affirmative.

I

Because this court has already issued an opinion in this case which sets out the facts and prior proceedings in detail, *Gardels v. Central Intelligence Agency*, 637 F.2d 770, 771–3 (D.C.Cir.1980), we merely capsule the background. Appellant Gardels, a student at the University of California (Los Angeles), sought disclosure by the CIA under FOIA of past and present arrangements and relationships between the Agency and the eleven campuses of that University. (This request was later narrowed to documents retrievable through five named divisions of the CIA and those reports given to Congressional committees.) Documents relating to overt contacts were released (some with deletions), but the Agency told Gardels that it would neither confirm nor deny the existence of any documents revealing cov-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

ert CIA connections with or interest in the University. Gardels then brought this suit in the District Court under FOIA, seeking disclosure whether the CIA had had such contacts. Affidavits were filed by both sides, interrogatories were answered by the Agency, depositions of CIA affiants were had. The CIA made a motion for summary judgment which was granted by the court below on the ground that the CIA's position accorded with Exemption 3 of the FOIA. 484 F.Supp. 368 (1980).

On appeal by Gardels, this court reversed (without in any way reaching the merits), solely because the Agency had filed an inadequate Statement of Material Facts As to Which There Is No Genuine Issue. 637 F.2d 770. The case was remanded so that the CIA should file a proper Statement, and the matter be decided on that basis with appropriate contest by plaintiff Gardels. After that was done, the District Court decided for the CIA again on the basis of Exemption 3. 510 F.Supp. 977 (1981)[1] This appeal now brings us to the merits.

## II

■ In the court below, the Agency defended its refusal to say whether or not it had had covert contacts with any person at the University of California by invoking Exemptions 1[2] and 3 of FOIA, 5 U.S.C. § 552(b)(1) and (3). The District Court, however, rested only on Exemption 3 (see 484 F.Supp. at 372; 510 F.Supp. at 978, n.1), as we do. That Exemption declares that disclosure is not required for matters that are:

(3) specifically exempted from disclosure by statute (other than section 552b of this title) provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

The particular statute relied on, in this connection, is a portion of section 403(d)(3) of the National Security Act of 1947, 50 U.S.C. § 403 *et seq.*:

... that the Director of Central Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure ...

It is settled, in this court, that section 403(d)(3), *supra,* is a statute falling within Exemption 3. See *Halperin v. Central Intelligence Agency,* 629 F.2d 144, 147 (D.C. Cir.1980), and decisions cited at n.7. We have likewise agreed that an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception. See *Phillippi v. Central Intelligence Agency,* 546 F.2d 1009, 1012 (D.C.Cir.1976); *Phillippi v. Central Intelligence Agency,* 655 F.2d 1325, 1330 (D.C.Cir. 1981).

■ The proper standard to determine whether section 403(d)(3) applies to such a situation is whether the CIA demonstrates that an answer to the query "can reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods." *Halperin v. Central Intelligence Agency, supra,* 629 F.2d at 147. The only issue open here is whether the District Court correctly found that the Agency has met that standard in this case.

## III

To make that showing, the CIA furnished affidavits from Agency officials strengthened by the depositions of some of them and by others to the effect that (a) the Agency needs, and uses as intelligence sources, covert contacts with American academics and students at American schools, and in general has continued to maintain such contacts; and (b) disclosure that such contacts were or were not made at the

---

1. The court also incorporated its prior opinion reported at 484 F.Supp. 368.

2. Exemption 1 exempts from disclosure matters "specifically authorized under criteria es-

tablished by an Executive order to be kept secret in the interest of national defense or foreign policy and ... are in fact properly classified pursuant to such Executive order."

University of California, or at any particular school, would trigger the danger that foreign intelligence agencies could (and would) discover who those covert contacts were, and could try to prevent its nationals from going to that university, and the American schools' teachers from visiting the foreign country (or from having contact with scholars in that country); and also would try to determine what research areas or subjects interested the CIA.

We need not spell out the CIA's need for these covert contacts because plaintiff-appellant does not really contest that part of the case. Suffice it that the CIA collects confidential information and advice from academics who have travelled abroad, studied a discipline pertinent to foreign intelligence, or can help in recruiting foreign intelligence sources; the Agency also has contracts for scientific research and development as well as for social science research related to foreign policy, and has private consultations between scholars and CIA research analysts. As one CIA affidavit puts it: "To perform our job properly we need the assistance, criticism, and perspective of the best professional talents available in the private sector."

The nub of this case is whether the CIA can say whether or not it has had such covert contacts at California without undermining the confidentiality of its intelligence sources, as well as those obtained through its hidden contacts. On that, the government affidavits and depositions stress that either answer would compromise sources and methods.

To admit that the CIA had such contact at this University would allow foreign intelligence agencies to "try to zero in and identify specifically what were the nature of those relationships or with whom the relationships were." Blake Dep. at 66, Joint App. at 130. The foreign intelligence entity could and probably would examine and take measures against those of its citizens who had studied at the university, could and would prevent its nationals from attending the university, and could and would curtail access and availability to academics from California (and other American schools) travelling abroad or seeking contact with foreign sources. To help it take countermeasures and to discover what the CIA is up to, the foreign intelligence organization can piece together information regarding the University and then target certain individuals or sectors of that university's life (including covert research work for the CIA)—once the Agency concedes that it has had covert contact there. In addition, other persons at the university may reveal, inadvertently or deliberately, academics they have reason to think are covert CIA contacts. All this is explained in detail in the CIA's affidavits and depositions.

On the other hand, the Agency has also articulated the dangers inherent in its denying that it had had any covert contacts with the University of California. The CIA has received more than 125 similar FOIA requests for information on covert contacts with American colleges and universities— covering about 100 different schools. If the Agency were required to indicate those schools with which it had had no covert contact, the work of foreign intelligence bodies would obviously be much easier; they could and would concentrate their efforts on the remaining American colleges and universities, and their sphere of activity could be appreciably narrowed.

## IV

■■ What the District Court did with this CIA presentation and what this Court must consider is "a de novo determination" of the propriety of the withholding, but in doing so the courts "must 'accord substantial weight'" to the Agency's determinations. *Ray v. Turner,* 587 F.2d 1187, 1194 (D.C.Cir.1978). Once satisfied that proper procedures have been followed and that the information logically falls into the exemption claimed, the courts "need not go further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith." *Weissman v. Central Intelligence Agency,* 565 F.2d 692, 697 (D.C.Cir.1977). Conversely, "summary judgment may be granted on

the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Halperin v. Central Intelligence Agency, supra,* 629 F.2d at 148. The test is not whether the court personally agrees in full with the CIA's evaluation of the danger—rather, the issue is whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field of foreign intelligence in which the CIA is expert and given by Congress a special role. *See* S.Rep.No.93–1200, 93d Cong., 2d Sess. 12, *reprinted in* [1974] U.S.Code Cong. & Ad. News 6267, 6290.

■ We hold, under that standard and our decisions, that the Agency has met the burden of showing that it acted permissibly in its judgment that to reveal or acknowledge covert contacts with the University might very well disclose some sources or methods of foreign intelligence (or both)— and that the Agency's judgment must be accepted.[3] The CIA position, detailed in affidavits and depositions, is specific and fleshed out as much as it can be done publicly, and is far from being merely conclusory; as a whole it appears "logical" and "plausible" in protecting our intelligence sources and methods from foreign discovery. In one word, it makes good sense. *See Halperin v. Central Intelligence Agency, supra,* 629 F.2d at 148; *Hayden v. National Security Agency,* 608 F.2d 1381, 1387–1388 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980).

■ Plaintiff's principal response to the CIA's detailed affirmative showing is that our focus should be limited to the University of California, an enormous school with many different sectors of study and research, and from that narrow viewpoint (it

is said) there is and could be no possible danger (through the mere statement that the Agency has had, or has not had, covert contacts at the University) to any sources or methods of foreign intelligence. Everyone already assumes, plaintiff urges, that a large, multi-faceted university like California must have had some sort of covert CIA contact at some point in the CIA's thirty-year history.

This position is not as persuasive as plaintiff thinks. First, an official recognition by the CIA itself that it has had such contact is significantly more than the assumption on which plaintiff relies—whether it be the assumption of foreign intelligence organizations, of the public at large, or of the university community. Official acknowledgement ends all doubt and gives the foreign organization a firmer basis for its own strategic or tactical response. *See Phillippi v. Central Intelligence Agency,* 655 F.2d 1325, 1332 (D.C.Cir.1981). "[T]he FOIA does not require the CIA to lighten the task of our adversaries around the world by providing them with documentary assistance from which to piece together the truth." *Ibid.*

More than that, the CIA has the right not to try to differentiate between "larger" and "smaller" schools, or schools with wider subjects of interest and those with less. The spectrum is broad and continuous, and it would be difficult, if at all possible for the CIA (or the courts), to separate California from other institutions according to the likelihood of the Agency's having had covert contacts with that particular school. Even small schools may well have scholars involved in matters of interest to the CIA, and information as to any school may be a pertinent advance (in the eyes of a foreign intelligence organization) toward discovery of the sources and methods the CIA has been using. Faced as it has been with some 125 FOIA requests from about 100 different schools, the Agency could properly decide to treat all such requests uniformly and apply

---

**3.** The District Court plainly followed the procedures mandated by this court in *Phillippi v. Central Intelligence Agency, supra,* 546 F.2d at 1013, as well as in the prior decision in this

case, *Gardels v. Central Intelligence Agency, supra,* 637 F.2d at 773–74. The record is as full as it can reasonably be expected to be.

a consistent rule of judgment to all the requests, nationwide. That is a reasonable and logical reaction to the mass of separate requests. This case simply cannot stand alone as if the University of California were all that were involved.

■ Nor should we reject the Agency's refusal to answer because it cannot prove conclusively that, if it responded, some intelligence source or method would in fact be compromised or jeopardized. This is necessarily a region for forecasts in which informed judgment as to potential future harm should be respected. *Halperin v. Central Intelligence Agency, supra,* 629 F.2d at 149. In appraising such potential harm "[w]e must take into account * * * that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself." *Id.* at 150. The CIA has the right to assume that foreign intelligence agencies are zealous ferrets.

■ There is a parallel answer to plaintiff's other plaint that there is no proven past history of compromise of sources and methods through acknowledgement of covert Agency activity at a place or institution. "[T]he purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after." *Halperin v. Central Intelligence Agency, supra,* 629 F.2d at 149. One significant aim of Exemption 3, as involved here, is protective—to prevent danger and compromise.[4]

■ Gardels' fall-back position is that, at the least, there is a sufficient, relevant dispute to warrant denial of summary judgment and a remand for trial or further proceedings. The material in plaintiff's

counter-presentation (as we here noted, *supra*) consists of conclusory denials of the Agency's position on the dangers from foreign intelligence, insistence that the case of California be considered alone, or episodic remembrances of the experiences of particular individuals (mainly statements limited to the University of California). These categories are all inadequate to raise a triable issue (or to call for further inquiry) as to the reasonableness and acceptability of the CIA's general judgment refusing to declare whether or not it has had covert contact. At bottom, plaintiff's material does no more than differ from the Agency's informed position which we must accept if plausible and reasonable. There is nothing in the countercase calling for a trial or further inquiry into the hard facts before the court can say whether the official position meets the required standard.[5]

## V

Plaintiff's final point is that the District Court should not have applied Exemption 3 without first determining that the withheld information was properly classified under Exemption 1. The latter (5 U.S.C. § 552(b)(1)) governs matters "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) [that] are in fact properly classified pursuant to such Executive order." Gardels' position is that then Executive Order 12065 covered everything the Executive believed, at that time, to be blanketed by the "intelligence sources and methods" provision of 50 U.S.C. § 403(d)(3), *supra,* and therefore that Exemption 3—which is all the District Court reached and all we have been considering—can apply only if the Executive Order likewise governs this case.

---

4. The other of plaintiff's points are mere conclusory or episodic statements by plaintiff's affiants contradicting the CIA's reasoned and detailed judgment—some of those points are discussed in Parts IV and V, *infra,* of this opinion.

5. In particular, the affidavit of C. Philip Liechty (a former CIA employee), giving his own views as to the lack of harm which would follow the

disclosure requested by plaintiff, is insufficient to undermine the Agency's presentation. A former agent's own position as to what a general CIA policy should be is hardly enough (at least in this instance) to call for a trial or more extensive judicial investigation. *See Snepp v. United States,* 444 U.S. 507, 512, 100 S.Ct. 763, 766, 62 L.Ed.2d 704 (1980).

 .This court has already rejected that approach. Exemption 3 is independent of Exemption 1 and may be invoked independently. *Goland v. Central Intelligence Agency,* 607 F.2d 339, 349 n.50 (D.C.Cir. 1978), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). Executive Order 12065 was not designed to incorporate into its coverage the CIA's full statutory power to protect all of its "intelligence sources and methods from unauthorized disclosure." Nor was the President attempting to cram into that Executive Order every aspect of the nondisclosure powers specifically given by Congress to various agencies in the Executive Branch. The Order suggests nothing of that kind, either expressly or by implication. There is considerable overlap, of course, but that Executive Order does not supersede section 403(d)(3), or make itself a prerequisite for application of that Exemption 3 statute.

### VI

We add explicitly that we do not affirm on the basis that the disclosure plaintiff seeks would set off an overt "campus campaign," led by so-called "campus activists," to uncover covert sources at institutions, with the consequence that there would be reluctance on the part of some individuals to aid the CIA. The government urges that as a separate reason for its policy of nondisclosure (the other being the capability of foreign intelligence services to uncover sources and methods if disclosure were allowed here—see Parts III–V, *supra*), but we do not accept that separate ground in this case.

 That position comes too close to the area of the free speech rights of students and the academic freedom of colleges and universities. Already some schools have considered whether or not to regulate ·or forbid their faculty members from undertaking covert work for the CIA. That subject is the province of the schools, their faculties, their students, and the public, not of the FOIA. The FOIA and its exemptions have nothing to do with the ways the schools and their personnel, acting on their own, react toward the CIA's activities. If a school independently chooses to bar the CIA from using its facilities or recruiting its students, the FOIA should not be used as a means of preventing or cabinning that choice, even though in some remote sense that school or its students may be said to be "interfering" with the recruitment of intelligence sources or the use · of intelligence methods. In that situation, there may be, of course, a clash of values, but it does not seem to us that Congress, in enacting the FOIA exemptions, has gone so far as to provide that the independent actions of a school or its students—not entangled with foreign intelligence services—to keep the CIA away from the school should be taken as a danger to intelligence sources or methods within the purview of Exemption 3 and section 403(d)(3). That is a policy problem "better resolved not in this court under the guise of a Freedom of Information Act case" (*Exxon Corp. v. Federal Trade Commission,* 663 F.2d 120, 130 (D.C.Cir.1980)), but in public debate.

*Affirmed.*