# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 16, 2006      Decided January 16, 2007

Nos. 05-5394 and 06-5072

PAUL WOLF,
APPELLANT

v.

CENTRAL INTELLIGENCE AGENCY AND
FEDERAL BUREAU OF INVESTIGATION,
APPELLEES

Appeals from the United States District Court
for the District of Columbia
(No. 01cv00729)

*Paul Wolf*, pro se, argued the cause for the appellant.

*Alan Burch*, Assistant United States Attorney, argued the cause for the appellees. *Kenneth L. Wainstein*, United States Attorney at the time the brief was filed, and *R. Craig Lawrence* and *Diane M. Sullivan*, Assistant United States Attorneys, were on brief for the appellees. *Michael J. Ryan*, Assistant United States Attorney, entered an appearance.

Before: HENDERSON, RANDOLPH and GRIFFITH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The appellant, Paul Wolf (Wolf), filed a Freedom of Information Act (FOIA), 5 U.S.C. §§ 552 *et seq*., request with the Central Intelligence Agency (CIA or Agency), seeking all records related to Jorge Eliecer Gaitan (Gaitan), a former (and deceased) Colombian politician. After the CIA refused to either confirm or deny the existence of such records, Wolf filed this suit. The CIA subsequently moved for summary judgment on the basis of two FOIA exemptions. In response, Wolf asserted that the Agency waived the exemptions through official acknowledgment of records regarding Gaitan during a 1948 congressional hearing. The district court rejected Wolf's official acknowledgment argument and upheld the CIA's exemption claims, granting summary judgment to the Agency. Wolf appeals. We affirm the district court except to the extent the Agency officially acknowledged the existence of records before the Congress in 1948; as to the latter, we remand to the district court for further proceedings.

**I**.

On April 9, 1948, Gaitan, a former Colombian presidential candidate, was assassinated in Bogota, Colombia. In the wake of his assassination, riots erupted in Bogota which prompted a congressional investigation into the alleged failure of the CIA to predict such unrest. At the hearing, then-CIA Director Admiral R. K. Hillenkoetter (Hillenkoetter) testified that the Agency had in fact predicted the explosive situation brewing in Bogota in 1948. A half century later, Wolf, a historical researcher interested in the life and death of Gaitan, submitted a FOIA request to the CIA seeking "all records about Jorge Eliecer

Gaitan." Reprinted at Appellant's App. at 2.[1] On September 22, 2000, the CIA issued a *Glomar* response[2] to Wolf's request, neither confirming nor denying the existence of records regarding Gaitan. Following an unsuccessful administrative appeal, Wolf filed suit in April 2001 seeking to compel the CIA to release responsive documents.

Before the district court, the CIA submitted the affidavit of Kathryn Dyer (Dyer Affidavit), the Agency's Information and Privacy Coordinator, in support of its *Glomar* response. *See* Dyer Affidavit, *reprinted in* Appellee's App. at 28. The Dyer Affidavit explained that official confirmation or denial of the existence of such records might damage both national security, through revelation of intelligence sources or methods, and foreign relations. More specifically, according to the Dyer Affidavit, acknowledgment of such records could disclose the identities of individuals, or categories of individuals, "in which the CIA is interested and upon which it focuses its methods and resources," thereby allowing foreign intelligence services to more effectively implement countermeasures to CIA information-gathering. *Id*. at 38–39. Moreover, the Agency asserted that acknowledgment of such records could upset diplomatic relations with foreign governments whose citizens had CIA files. As a consequence, the CIA claimed that the existence of records regarding a foreign national constitutes

---

[1] Wolf made a similar request for records of the Federal Bureau of Investigation (FBI), which failed to respond until after Wolf filed suit. That request is not part of this appeal.

[2] *See infra* p. 5.

classified information, making its *Glomar* response appropriate under FOIA Exemptions 1 and 3.[3]

The CIA moved for summary judgment on the strength of the Dyer Affidavit. Wolf responded by filing a cross-motion for summary judgment, contending that the Agency waived the exemptions as a result of Hillenkoetter's 1948 congressional testimony. During his testimony, Wolf alleged, Hillenkoetter read from official CIA dispatches referencing Gaitan, thereby acknowledging that the CIA had responsive records. Concluding that the Dyer Affidavit explained in reasonably specific detail the danger to intelligence sources and methods if the existence of responsive records were disclosed, the district court held that Exemptions 1 and 3 applied. Because the district court found "no indication from the transcript [of the congressional hearing] that the CIA director was reading from anything more than a prepared statement for the hearing," *Wolf v. CIA*, 357 F. Supp. 2d 112, 118 (D.D.C. 2004), the court held that the Agency did not waive the FOIA exemptions through official acknowledgment of records regarding Gaitan. As a result, the district court granted the CIA's motion for summary judgment. Wolf now appeals.

---

[3]Exemption 1 permits an agency to withhold "matters" from FOIA disclosure if such matters are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Exemption 3 shields matters "specifically exempted from disclosure by statute . . ., provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

## **II**.

The FOIA mandates broad disclosure of government records to the public, *CIA v. Sims*, 471 U.S. 159, 166 (1985), subject to nine enumerated exemptions. *See* 5 U.S.C. § 552(b). Given the FOIA's broad disclosure policy, the United States Supreme Court has "consistently stated that FOIA exemptions are to be narrowly construed." *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988). Nevertheless, the CIA "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see also Miller v. Casey*, 730 F.2d 773, 776–77 (D.C. Cir. 1984); *Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976). Such an agency response is known as a *Glomar* response and is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption. *See, e.g.*, *Hunt v. CIA*, 981 F.2d 1116, 1118 (9th Cir. 1992); *Phillippi*, 546 F.2d at 1011 (acknowledging CIA refusal to confirm or deny existence of records regarding activities of ship named *Hughes Glomar Explorer*). In determining whether the existence of agency records *vel non* fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases. *See, e.g.*, *Gardels*, 689 F.2d at 1103–05.[4]

---

[4]Wolf challenges the general concept of a *Glomar* response, claiming that *de novo* review of the Agency's response requires the district court to order the Agency to search for responsive records and to submit a *Vaughn* index. *See* Appellant's Brief at 9; *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). His argument misunderstands the nature of a *Glomar* response, which narrows the FOIA issue to the existence of records *vel non*. Indeed, "[w]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other

Under the FOIA, "the burden is on the agency to sustain its action," 5 U.S.C. § 552(a)(4)(B), and we review *de novo* the agency's use of a FOIA exemption to withhold documents. *Miller*, 730 F.2d at 776. Yet in conducting *de novo* review in the context of national security concerns, courts "must 'accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'" *Id.* (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)) (emphasis in original); *see also Krikorian v. Dep't of State*, 984 F.2d 461, 464 (D.C. Cir. 1993) (noting deference to expertise of agencies engaged in national security and foreign policy). Indeed, "[s]ummary judgment is warranted on the basis of agency affidavits when the affidavits describe 'the justifications for nondisclosure with reasonably specific detail . . . and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Miller*, 730 F.2d at 776 (quoting *Military Audit Project*, 656 F.2d at 738). Moreover, a reviewing court "must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm." *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980). Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears "logical" or "plausible." *See Gardels*, 689 F.2d at 1105; *Hayden v. NSA*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

### III.

The CIA submitted the Dyer Affidavit to support its refusal to either confirm or deny the existence of records pertaining to

---

than the affidavits which explain the Agency's refusal." *Phillippi*, 546 F.2d at 1013.

Jorge Gaitan. The question, then, is whether the existence of Agency records regarding an individual foreign national constitutes information itself protected by either FOIA Exemption 1 or Exemption 3. Proper invocation of, and affidavit support for, either Exemption, standing alone, may justify the CIA's *Glomar* response. *See Miller*, 730 F.2d at 775; *Gardels*, 689 F.2d at 1107 (noting Exemptions 1 and 3 may be invoked independently).

**A.**

The Agency justifies its *Glomar* response under Exemption 1 based on the classification criteria of Executive Order 12958.[5]

---

[5]Executive Order 12958 provides agency heads with original classification authority. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19,825, 19,827 § 1.4(a)(2) (Apr. 17, 1995); *see also* Exec. Order No. 13,292, 68 Fed. Reg. 15,315 (Mar. 25, 2003) (amending, in other respects, Executive Order 12958). Classification authority may also be exercised by subordinate officials to whom such authority is delegated, 60 Fed. Reg. at 19,827 § 1.4(a)(3), by an agency head, *id*. § 1.4(c)(2)–(3), in writing, *id*. § 1.4(c)(4). Through an internal Agency memorandum, the Director of the CIA delegated original classification authority to the Director of Information Management (Director). *See* Admin. Rec. 70-3, Annex A, Original Classification Authorities at 1, 3 (June 3, 1997). Further, the Director chairs the Agency Release Panel (ARP), 32 C.F.R. § 1900.41(c)(1) (2006), which makes final determinations regarding administrative appeals under the FOIA. *See* 32 C.F.R. § 1900.41(a)–(c)(2). In this case, the ARP, chaired by the Director, determined that the existence or nonexistence of records responsive to Wolf's FOIA request is classified information that would tend to reveal intelligence sources and methods. Appellee's App. at 30–31. Dyer, as Information and Privacy Coordinator, serves as the ARP Executive Secretary. 32 C.F.R. § 1900.41(c)(2). Thus, the Dyer Affidavit reflects personal knowledge, obtained in Dyer's official capacity, regarding the

*See* Appellee's Brief at 7; 60 Fed. Reg. 19,825 (Apr. 17, 1995). Executive Order 12958 permits an original classification authority to classify information only if "the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security . . . and . . . is able to identify or describe the damage." 60 Fed. Reg. at 19,826 § 1.2(a)(4). Such damage to national security may be claimed only with respect to certain categories of information, specifically information that "concerns . . . intelligence sources or methods" or the "foreign relations . . . of the United States." *Id*. at 19, 827 § 1.5(c)–(d). Further, the Supreme Court has recognized the broad sweep of "intelligence sources" warranting protection in the interest of national security. *See Fitzgibbon v. CIA*, 911 F.2d 755, 760–63 (D.C. Cir. 1990) (including "unsuspecting," "*potential*" and past sources of information) (emphasis in original) (citing *Sims*, *supra*).

The Dyer Affidavit asserts that confirmation or denial of the existence of records regarding a foreign national could reasonably be expected to damage national security or foreign relations. *See* Appellee's App. at 29 (describing "conclusions [Dyer] reached and determinations [she] made"). Consequently, if the Dyer Affidavit plausibly explains the danger, the existence of records *vel non* is properly classified under Executive Order 12958 and justifies the Agency's invocation of Exemption 1. *See Gardels*, 689 F.2d at 1105; *Hayden*, 608 F.2d at 1388. Initially, Dyer describes the CIA's interest in an individual foreign national as an intelligence source or method, an interest that could "be thwarted or made more difficult, reducing the

classified nature of information related to the existence or nonexistence of records responsive to Wolf's FOIA request. Appellee's App. at 29, 31.

CIA's effectiveness," upon disclosure that the Agency has such records. *See* Appellee's App. at 40–41. More specifically, Dyer asserts that the Agency utilizes foreign nationals as sources in order to carry out its intelligence-gathering duties and also targets foreign nationals as subjects of surveillance. *See id.* at 34, 36–37. With regard to foreign nationals as sources of information, "the Agency must often depend upon information that can only be garnered from knowledgeable sources under an arrangement of absolute secrecy." *Id.* at 33. Indeed, human resources abroad often refuse to aid the CIA absent assurances of confidentiality because "official confirmation of [a source's] cooperation [with the Agency] could cause the target government to take retaliatory action against that person, or, if he is no longer alive, against his surviving family and friends." *Id.* at 34. Thus, the Dyer Affidavit explains, acknowledgment that the Agency maintains contact with a specific foreign national "would . . . seriously damage this nation's credibility with all other current intelligence sources and undermine CIA's ability to attract potential intelligence sources in the future." *Id.* at 35; *see also id.* ("If the U.S. Government were to breach this confidentiality, whether three or 30 years later, present and potential sources throughout the world could reasonably be expected to conclude that the U.S. Government is unable to maintain such confidentiality.").

Moreover, the Dyer Affidavit explains that revealing that the CIA maintains records regarding specific foreign nationals could potentially reveal targets of CIA surveillance and, thus, CIA methods. *See id.* at 38. According to the Agency, the existence or nonexistence of records regarding a foreign national would signal to a foreign intelligence service "the specific persons and areas in which the CIA is interested and upon which it focuses its methods and resources." *Id.* Because "[e]very country or group has limited resources[,] [t]he disclosure to a potential U.S.

intelligence target of the areas and persons of CIA interest would indicate to that target how the CIA is allocating its resources [and] [t]herefore, the target may array its counterintelligence and security resources most efficiently to frustrate the CIA." *Id*. at 38–39.

In addition to the likely damage to intelligence sources and methods, the Dyer Affidavit outlines the potential harm to foreign relations that would reasonably result from confirming or denying the existence of Agency records about a foreign national. *Id*. at 41–42. Specifically, Dyer asserts that a foreign government, "whether friend or adversary," could construe the fact "that the CIA maintains information concerning a covert relationship with a particular foreign national" as evidence "that the CIA has collected intelligence information on or recruited one of its citizens or resident aliens." *Id*. at 41. Not surprisingly, the Agency asserts, "[s]uch a perception could be expected to affect adversely U.S. foreign relations with that nation[,] . . . especially . . . where U.S. allies are concerned." *Id*.

In light of the substantial weight accorded agency assertions of potential harm made in order to invoke the protection of FOIA Exemption 1, the Dyer Affidavit both logically and plausibly suffices. *See Gardels*, 689 F.2d at 1105; *Hayden*, 608 F.2d at 1388. It is plausible that either confirming or denying an Agency interest in a foreign national reasonably could damage sources and methods by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources. *See Gardels*, 689 F.2d at 1106 ("The CIA has the right to assume that foreign intelligence agencies are zealous ferrets."). Indeed, "'[w]e must take into account . . . that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of

information.'" *Fitzgibbon*, 911 F.2d at 763 (quoting *Gardels*, 689 F.2d at 1106) (alteration in original).

Moreover, it is logical to conclude that the need to assure confidentiality to a foreign source includes neither confirming nor denying the existence of records even decades after the death of the foreign national. For example, in *Fitzgibbon* we recognized that the passage of thirty years from the individual's death failed to negate the necessity of confidentiality because "the Government has a compelling interest in protecting . . . *the appearance of confidentiality* so essential to the effective operation of our foreign intelligence service." *See id*. at 763–64 (emphasis in original) (internal quotation omitted). Accordingly, we conclude that the existence or nonexistence of Agency records regarding Gaitan is properly classified information and therefore shielded from disclosure under Exemption 1.

## B.

The CIA invokes Exemption 3 as an alternative basis of its *Glomar* response. As noted earlier, Exemption 3 permits an agency to withhold information "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). In this regard, the CIA maintains that the existence or nonexistence of records about a foreign national is protected from disclosure under the National Security Act, 50 U.S.C. §§ 401 *et seq*. *See*, *e.g*., *Krikorian*, 984 F.2d at 465; *Gardels*, 689 F.2d at 1103. Specifically, the National Security Act makes the CIA Director responsible for "protect[ing] intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-3(c)(6) (2000).[6]

---

[6]The structure and responsibilities of the United States intelligence community have undergone reorganization in recent years. As a consequence, the duties of the CIA Director are described as they

Indeed, information is exempt under section 403-3(c)(6) if the Agency "demonstrates that an answer to the query can reasonably be expected to lead to unauthorized disclosure." *Gardels*, 689 F.2d at 1103 (internal quotation omitted).

The Supreme Court gives even greater deference to CIA assertions of harm to intelligence sources and methods under the National Security Act. *See Sims*, 471 U.S. at 168–69 ("The plain meaning . . . of the National Security Act . . . indicates that . . . Congress entrusted [the CIA] with sweeping power to protect its 'intelligence sources and methods.'"). Because "the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after," *Halperin*, 629 F.2d at 149, "the Director of Central Intelligence may protect all intelligence sources, regardless of their provenance," *Fitzgibbon*, 911 F.2d at 762. As with Exemption 1, the Agency relies on the Dyer Affidavit to establish that disclosure of information regarding whether or not CIA records of a foreign national exist would be unauthorized under Exemption 3 because it would be reasonably harmful to intelligence sources and methods. *See Gardels*, 689 F.2d at 1103–04. As discussed earlier, Dyer's detailing of harm satisfies the requirements of Exemption 1 and, coupled with the greater deference afforded the Agency under the National Security Act, we believe that the CIA also properly invoked Exemption 3 in support of its *Glomar* response.

---

existed at the time of Wolf's FOIA request in 2000. Under the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, the new Director of National Intelligence is similarly required to "protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1).

**IV**.

Although the CIA properly invoked Exemptions 1 and 3, Wolf asserts that the Agency waived both of them by officially acknowledging the existence of records regarding Gaitan during the 1948 congressional testimony of then-CIA Director Hillenkoetter. Indeed, "when information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Fitzgibbon*, 911 F.2d at 765. An agency's official acknowledgment of information by prior disclosure, however, cannot be based on mere public speculation, no matter how widespread. *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (rejecting suggestion that public speculation about CIA liaison with Iranian government constituted prior disclosure). Instead, an official acknowledgment must meet three criteria:

> First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an official and documented disclosure.

*Fitzgibbon*, 911 F.2d at 765; *see also Public Citizen v. Dep't of State*, 11 F.3d 198, 202 (D.C. Cir. 1993); *Afshar*, 702 F.2d at 1133. Thus, the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption. *See Fitzgibbon*, 911 F.2d at 766.

As a consequence, "a plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar*, 702 F.2d at 1130. Prior disclosure of similar information does not suffice; instead, the *specific*

information sought by the plaintiff must already be in the public domain by official disclosure. *Public Citizen*, 11 F.3d at 201, 203. The insistence on exactitude recognizes "the Government's vital interest in information relating to national security and foreign affairs." *Id.* at 203; *see also Military Audit Project*, 656 F.2d at 752–53 (rejecting claim that public disclosure of some information overlapping with content of requested material results in waiver as to all information).

While FOIA requesters often invoke agency waiver in order to overcome FOIA exemptions, the "official acknowledgment" standard has not yet been applied in the context of a *Glomar* response. In most waiver cases, the inquiry turns on the match between the information requested and the content of the prior disclosure. For instance, in *Fitzgibbon* we rejected the plaintiff's argument that congressional testimony establishing the existence of a CIA station in the 1960s waived Exemption 3's protection of records about the station in the 1950s because the time period specified in the plaintiff's FOIA request did not match the time period of the prior disclosure. *See* 911 F.2d at 765–66.

Wolf requested "[a] copy of all records about Jorge Eliecer Gaitan." Appellee's App. at 29. The CIA's *Glomar* response pinpointed the "specific information at issue" as the existence of Agency "records about Jorge Eliecer Gaitan" *vel non*. *Id*. In the *Glomar* context, then, if the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information.

Wolf asserts that former CIA Director Hillenkoetter's testimony before the Congress in 1948 established the existence of Agency "records about" Gaitan. *See* Appellant's Br. at 23.

The district court rejected this contention, concluding that "there is no indication from the transcript that the CIA director was reading from anything more than a prepared statement for the hearing. Moreover, Admiral Hillenkotter [sic] never made a specific reference in his testimony to reading from any report or other official document." *Wolf*, 357 F. Supp. 2d at 118. We do not agree.

Although Hillenkoetter's testimony appears to be a prepared statement, *see* Special Subcommittee of the Committee on Expenditures in the Executive Departments (April 15, 1948), *reprinted in* Appellant's App. at 28,[7] the CIA Director also explicitly "read some excerpts of dispatches relating to the[] disturbances" that followed Gaitan's assassination. *Id*. at 22 (reciting information "obtained by people working for Central Intelligence" in Colombia). The excerpts included references to Gaitan, his followers and their associates in connection with possible communist activity in Colombia. *See id*. at 22–23 (reading report from January 2, 1948 describing "[a] professor at the national university and a member of the Colombian Soviet Cultural Exchange" who "is known to be close to and an advisor of Gaitan").[8] Further, Hillenkoetter suggested that the

---

[7]At one point during the hearing, Representative Clarence Brown asked Hillenkoetter whether he had "conclude[d] [his] prepared statement for the record." Appellant's App. at 28. Hillenkoetter indicated that he had completed his prepared statement, thereby opening the hearing to further questions. *Id*.

[8]At oral argument, the CIA did not dispute that the references to Gaitan in Hillenkoetter's testimony constitute "records" about Gaitan within the meaning of the FOIA. *Cf. Tobey v. NLRB*, 40 F.3d 469, 471 (D.C. Cir. 1994) (under Privacy Act definition of "record," 5 U.S.C. § 552a(a)(4), inclusion of individual's name in document does

dispatches were Agency documents containing sensitive information typically passed on to the Department of State. *Id.* at 28–29 (confirming that dispatches "[were] forwarded to the State Department"). Because the "*specific information at issue*," *Public Citizen*, 11 F.3d at 203, is the existence *vel non* of "records about Jorge Eliecer Gaitan," Appellee's App. at 29, Hillenkoetter's testimony confirmed the existence thereof. Accordingly, the Agency's *Glomar* response does not suffice regarding the dispatch excerpts that reference Gaitan because the same "officially acknowledge" the fact that CIA records "about Jorge Eliecer Gaitan" exist.

We must now resolve the nature of the information to which Wolf is entitled. The CIA's official acknowledgment waiver relates only to the existence or nonexistence of the records about Gaitan disclosed by Hillenkoetter's testimony. As a result, Wolf is entitled to disclosure of that information, namely the existence of CIA records about Gaitan that have been previously disclosed (but not any others). *Cf. Fitzgibbon*, 911 F.2d at 765 (agency may be compelled to disclose officially acknowledged information) (citing *Afshar*, 702 F.2d at 1133). To determine whether the *contents*—as distinguished from the *existence*—of the officially acknowledged records may be protected from disclosure by Exemptions 1 and 3 (or both), however, we remand the case to the district court where the CIA must either disclose any officially acknowledged records or establish both that their contents are exempt from disclosure and that such exemption has not also been waived by the 1948 congressional testimony. *See Am. Civil Liberties Union v. Dep't of Def.*, 389

not constitute "information . . . 'about'" individual and thus "record" subject to disclosure); *Doe v. FBI*, 936 F.2d 1346, 1353 (D.C. Cir. 1991) (FOIA definition of "law enforcement record" applied to Privacy Act in light of similarity of statutory language).

17

F. Supp. 2d 547, 566 (S.D.N.Y. 2005) (finding that government officially acknowledged existence of memorandum and requiring that government either produce document or "prove that the [contents of related documents] are exempt from production").

## V.

In sum, we affirm the district court's holding that the existence or nonexistence of records about Gaitan is itself classified information and protected from disclosure by Exemptions 1 and 3 of the FOIA. We reverse the district court, however, to the extent that it held that the existence of Agency records about Gaitan was not officially acknowledged by the CIA in testimony before the Congress in 1948. We therefore remand the case to the district court for proceedings consistent with this opinion.

*So ordered.*