PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, Powell, and Kelsey, JJ., and Millette, S.J.

VIRGINIA DEPARTMENT OF CORRECTIONS

v.  Record No. 141780

SCOTT A. SUROVELL

OPINION BY
JUSTICE CLEO E. POWELL
SEPTEMBER 17, 2015

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jane M. Roush, Judge

The Virginia Department of Corrections ("VDOC") appeals a judgment of the Circuit Court of Fairfax County ("circuit court") granting, in part, a verified petition for writ of mandamus ("petition") filed by Scott A. Surovell ("Surovell").  In his petition, Surovell requested "documents pertaining to various aspects of executions conducted in Virginia from VDOC through the [Virginia Freedom of Information Act, Code § 2.2-3700 et seq.]" ("VFOIA").

I.  BACKGROUND

Following a hearing on Surovell's petition, the circuit court ordered VDOC to produce the following documents: (1) Document 7a, the detailed floor plan of the execution chamber ("L-Unit") at Greensville Correctional Center in Jarratt, Virginia ("Greensville"), in full; (2) Document 7b, the detailed diagram of the control panel and the wiring for the electric chair, in full; (3) Documents 8a-8f, the manufacturer's installation and instruction manuals for the electric chair, in full; and (4) Documents 9a-9f, the current and prior execution manuals, "in redacted

form with the information relating to the transportation from Sussex I[1] exempt and the information from the time pertaining to the L-Unit produced."[2]

Michelle Howell ("Howell"), the Legal Issues Coordinator for VDOC, handled Surovell's VFOIA request. Howell testified that the floor plan of the L-Unit is very detailed and shows where the entrances and exits to the execution chamber are located. The manufacturers' manuals are also highly detailed in that they show schematics for equipment used on the electric chair and how they are installed, maintained, and operated. Howell testified that the L-Unit's security could be affected by disclosure of these documents because it could allow someone to interrupt an execution by knowing how the electric chair was installed and "where the lines ran out." Howell also testified that it was a long-standing policy that VDOC's execution manuals were "security document[s]" not to be released.

Arnold Robinson, Chief of Corrections Operations for VDOC, testified as an expert in the field of corrections operations. As part of his job, Robinson assesses security issues within VDOC and oversees yearly evaluations to ensure each VDOC facility is "prepared for anything that could confront us as an agency." Robinson has been involved in security planning when a death row inmate is moved from Sussex I to Greensville.

Robinson testified that the execution chamber is housed in the L-Unit, which is a maximum-security level facility inside of Greensville, which is a medium-security level prison facility. The L-Unit is 30 feet away from other prison structures and is surrounded by a 12 to 16 foot high double perimeter fence. Greensville itself is surrounded by a double perimeter fence

---

[1] Death row inmates are housed in the Sussex I State Prison ("Sussex I").
[2] Documents 7a, 7b, and 8a-8f are contained in the record under seal. Documents 9a-9f were described, but not physically  presented, to the circuit court.

with six guard towers.[3] There are more than six gates between the entry point at Greensville to the L-Unit. While the L-Unit can hold up to three condemned inmates, only one inmate at a time has been in it during Robinson's time as Chief of Corrections Operations. The execution team, along with members of VDOC's executive staff, have access to the execution chamber along with maintenance staff accompanied by support personnel.

Robinson discussed various escape attempts, from the 1984 escape of six condemned inmates to John Allen Muhammad's plan to escape while being moved to the L-Unit. Robinson testified that people who are for or against the death penalty, as well as media, are assigned designated areas just outside of Greensville on the day of an execution. Robinson claimed that VDOC was aware of the groups on either side of the issue that had "the potential to do extreme harm, meaning assault the facility." Prior to and on the day of an execution, VDOC is concerned about internal and external threats that could disrupt the execution as well as maintaining the orderly operation and safety of Greensville, which has over 3,000 inmates and 1,000 staff, and any number of public visitors.

Robinson stated that a prison riot occurred over 30 years ago and some staff were injured, but the execution proceeded anyway. Several years ago, a witness to an execution attempted to leave — which would have thwarted the execution because, by statute, a set number of witnesses are needed; however, a replacement was found. Robinson stated that this could have been a security issue depending on the reaction by the victim's family. Robinson testified that VDOC brings additional staff to deal with external or internal contingencies on the day of an execution, and that VDOC is prepared should an external threat, such as a vehicle or heavy weaponry, or an

---

[3] While no inmate has ever gone over the fence surrounding the L-Unit, an inmate had escaped the internal perimeter of Greensville by scaling a fence before he was caught.

internal threat, such as a smuggled in weapon, be used to attack the L-Unit in an attempt to disrupt an execution.

Robinson testified to concerns about the safety of the members of the execution team and their ability to do their jobs should information relating to them or the inner workings of the execution unit ever be disclosed. However, Robinson testified that contingency plans are in place in case anything should happen during an execution. Robinson was also concerned about the safety of the condemned inmate in that, prior to the execution, the inmate could attempt to harm himself, or the victim's family could try to do something to the inmate.

Robinson identified the following security concerns about disclosing the withheld documents. Regarding the floor plan for the execution chamber, Robinson was concerned because it identifies the security components in place, potential areas of weakness, and the layout of the wiring to the electric chair. Regarding the electrical schematic, Robinson was concerned because it could allow people to come up with plans to stop an execution which "could result in harm to staff." Regarding the manufacturers' manuals, Robinson was concerned that they are specific to the electric chair in Virginia and that individuals who knew the components could use that information to plan to attack the system and the facility in order to stop the execution.

The VDOC's execution manuals detail "the step-by-step process that has to occur in an execution." The execution manuals also "delineate[] the process and approximate[] the . . . specific times" for events occurring in that process. The execution manuals do not specify when an inmate has to be transferred from Sussex I to the L-Unit, but they do outline the process for the transfer. Robinson was concerned that disclosure of the execution manuals could "allow someone to know the specifics about how we manage and operate that unit, [and] that they then

4

could take that knowledge, if it was made public, and use it in a way to plan to stop, harm, or kill individuals involved in that process. They include the offender."

Jonathan Sheldon, an attorney who has observed three executions, one by electrocution and two by lethal injection, testified on Surovell's behalf. Sheldon described the general layout of Greensville, how he has become approved to attend an execution, the process he undergoes to gain entry to Greensville and the L-Unit on the day of an execution, the security measures in place, the layout of the execution chamber, and his observations of what has occurred during the executions he has observed. Sheldon stated he took notes during an execution and kept them for future reference. Sheldon also admitted to speaking to a member of the execution team and to a doctor who attended executions without any confidentiality issues.

At the conclusion of the hearing, the circuit court announced findings that

> 7A and B, I'm not finding that the security exemption is well placed, here; I'm going to require disclosure of 7A and 7B, as well as 8A-8F, . . . the manufacturers' manuals. I don't think that that is a bona fide security concern; I'm going to require disclosure of that.

> And as far as the execution manuals, I think we all agree that transporting the prisoner from Sussex I to Greensville, and the protocol of that, and the details of that are genuine security concerns that were disclosed, but I think certainly from the time that the inmate arrives at [the L-Unit], it's not a bona fide security concern, so I'm going to require the production of the manual, those pages that relate to and appendices which relate to . . . what happens from the moment the prisoner arrives in [the L-Unit] until the completion of the execution.

## II. Analysis

### A. Standard of Review

"Under well-established principles, an issue of statutory interpretation is a pure question of law which we review de novo." Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007).

> Whether documents . . . should be excluded under Code § 2.2-
> 3705.[2(6)] is a mixed question of law and fact. See Napper v.
> ABM Janitorial Servs., 284 Va. 55, 61, 726 S.E.2d 313, 316
> (2012). Therefore, "[w]e give deference to the trial court's factual
> findings and view the facts in the light most favorable to the
> prevailing part[y,] but we review the trial court's application of the
> law to those facts de novo." Tuttle v. Webb, 284 Va. 319, 324,
> 731 S.E.2d 909, 911 (2012) (quoting Caplan v. Bogard, 264 Va.
> 219, 225, 563 S.E.2d 719, 722 (2002)).

American Tradition Inst. v. Rector and Visitors of the Univ. of Va., 287 Va. 330, 338-39, 756

S.E.2d 435, 439 (2014) (second and third alterations in original).

## B. VFOIA

On appeal, VDOC asserts that the circuit court erred in requiring production of the

documents at issue, whether in redacted form or in full.

> The Virginia [Freedom of Information Act] "has existed, in one
> form or another, since 1968" with the primary purpose of
> facilitating "openness in the administration of government."
> American Tradition Inst., 287 Va. at 339, 756 S.E.2d at 439-40.
> By its own terms, the statute puts the interpretative thumb on the
> scale in favor of disclosure: "The provisions of [VFOIA] shall be
> liberally construed to promote an increased awareness by all
> persons of governmental activities and afford every opportunity to
> citizens to witness the operations of government." Code § 2.2-
> 3700(B). Disclosure exemptions must be "narrowly construed" in
> favor of disclosure. Id.

Fitzgerald v. Loudoun Cnty. Sheriff's Office, 289 Va. 499, 505, 771 S.E.2d 858, 860-61 (2015).

While VFOIA expresses a clear legislative preference for "openness", it simultaneously

mandates that certain records be excluded from production. Id. Code § 2.2-3705.2 provides that

certain records relating to public safety are excluded from VFOIA's disclosure requirements.

Among the records excluded are

> [e]ngineering and architectural drawings, operational, procedural,
> tactical planning or training manuals, or staff meeting minutes or
> other records, the disclosure of which would reveal surveillance
> techniques, personnel deployments, alarm or security systems or
> technologies, or operational and transportation plans or protocols,

6

> to the extent such disclosure would jeopardize the security of any governmental facility, building or structure or the safety of persons using such facility, building or structure.

Code § 2.2-3705.2(6).

We begin our analysis with the canon of construction stated in the VFOIA itself, which indicates there is a strong preference for disclosure. Code § 2.2-3700(B). Moreover, Code § 2.2-3713(E) provides: "In any action to enforce the provisions of this chapter, the public body shall bear the burden of proof to establish an exemption by a preponderance of the evidence." Against this backdrop, we analyze Code § 2.2-3705.2(6), which clearly provides that certain records related to public safety are excluded from required disclosure to the extent such disclosure would jeopardize the security of the governmental facility or the safety of persons using such facility. The section also explicitly provides, in the introductory text, that certain documents that are excluded may nevertheless be disclosed by the custodian of those documents in his discretion. Code § 2.2-3705.2 (first paragraph).

To determine the application of Code § 2.2-3705.2 to the documents at issue in this case, we must decide several issues: (1) what level of showing must a proponent of the disclosure exemption make to establish that disclosure "would jeopardize" the security of any governmental facility, and (2) considering the competing interests of openness and security, what amount of weight should a circuit court afford the opinion of the VDOC in determining whether it has carried its burden by a preponderance of the evidence to demonstrate that disclosure would jeopardize the security of the facility. Christian v. State Corp. Comm'n, 282 Va. 392, 399, 718 S.E.2d 767, 771 (2011) (the public body "has the burden of proof to establish an exemption by a preponderance of the evidence," quoting Code § 2.2-3713 (E)).

### 1. "Would Jeopardize"

The Commonwealth argues that Surovell mistakenly reads Code § 2.2-3705.2(6) as requiring VDOC to prove that release of the records would actually cause a security breach or harm to persons. We agree that this is an overstatement of VDOC's burden.

Code § 2.2-3705.2(6) provides for exclusion from disclosure to the extent such disclosure would jeopardize security. As the Commonwealth argues, jeopardize simply means "to expose to danger (as of imminent loss, defeat, or serious harm)." Webster's Third New International Dictionary 1213 (1993). To the extent that releasing documents would expose a governmental facility to danger, the standard is met. VDOC need not "prove conclusively that, if it responded, some [facility's security] would in fact be compromised or jeopardized." Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1106 (D.C. Cir. 1982). See Halperin v. Central Intelligence Agency, 629 F.2d 144, 149 (D.C. Cir. 1980) ("The purpose of . . . security exemptions to the FOIA is to protect [sensitive categories of information] before they are compromised and harmed, not after."). A circuit court must take into account that any agency statement of threatened harm to security will always be speculative to some extent, in the sense that it describes a potential future harm rather than an actual harm. The question placed before the court is only whether the potential danger is a reasonable expectation.

2. Weight to be Given to Agency Expertise

Next, we must determine how much weight should be afforded to the opinion of VDOC's senior staff in assessing whether disclosure would jeopardize or increase the risk to the security of the L-Unit. VDOC's purpose is to manage prisons and their inmates. Code § 53.1-1 et seq. VDOC is specifically tasked with carrying out court-ordered executions. Code § 53.1-232 et seq. During his testimony, Robinson identified simultaneous areas of concern that arise during the course of an execution. Specifically, during an execution, there are concerns for the personal

8

safety of all persons, including the condemned inmate and prison staff, attending the execution; the potential for an inmate to facilitate an escape from custody; the orderly administration of the L-Unit and Greensville as a whole; and the orderly administration of the execution procedure.

While we have not addressed the issue in this context, other courts, including the United States Supreme Court, have recognized that "[t]he administration of a prison . . . is 'at best an extraordinarily difficult undertaking.'" Hudson v. Palmer, 468 U.S. 517, 527 (1984) (citations omitted). In the national security context, federal courts "'accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record.'" Wolf v. Central Intelligence Agency, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting Miller v. Casey, 730 F.2d 773, 776 (D.C. Cir. 1984) (quotations omitted)). In Gardels, the United States Court of Appeals for the D.C. Circuit held that

> [t]he CIA position, detailed in affidavits and depositions, is specific and fleshed out as much as it can be done publicly, and is far from being merely conclusory; as a whole it appears "logical" and "plausible" in protecting our intelligence sources and methods from foreign discovery. In one word, it makes good sense.

Gardels, 689 F.2d at 1105.

We give deference to the expert opinions of correctional officials charged with maintaining the safety and security of their employees, the inmates, and the public at large.

> [A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators. Rhodes v. Chapman, 452 U.S. 337, 349, n.14 (1981).
>
> As can be seen from these principles, the Department of Corrections has obligations with regard to prison security and the confinement of prisoners which are separate and distinct from its duty under the FOIA to provide a reasonable opportunity for persons to inspect its nonexempt public records.

Mithrandir v. Department of Corrections, 416 N.W.2d 352, 354 (Mich. Ct. App. 1987). "The test is not whether the court personally agrees in full with the [agency's] evaluation of the danger

9

-- rather, the issue is whether on the whole record the [a]gency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility in this field" of prison security. Gardels, 689 F.2d at 1105.

We adopt the approach expressed by these courts and hold that the circuit court must make a de novo determination of the propriety of withholding the documents at issue, but in doing so, the circuit court must accord "substantial weight" to VDOC's determinations. Wolf, 473 F.3d at 374. See Ray v. Turner, 587 F.2d 1187, 1194 (D.C. 1978) ("[D]e novo review in the national security context can be summarized as follows: (1) The government has the burden of establishing an exemption. (2) The court must make a de novo determination. (3) In doing this, it must first 'accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record.'"). Once satisfied that proper procedures have been followed and that the information logically falls within the exemption clause, courts need go no further to test the expertise of the agency, or to question its veracity when nothing appears to raise the issue of good faith. Gardels, 689 F.2d at 1105.

Here, Robinson, a corrections operations expert, testified that disclosure of these documents could jeopardize the L-Unit, the VDOC employees in the L-Unit, the inmates, and the public visitors who are attending an execution. He testified that he conducts yearly evaluations to ensure each VDOC facility is "prepared for anything that could confront us as an agency." Robinson noted that there are groups on either side of the issue of whether the death penalty is constitutional that have "the potential to do extreme harm, meaning assault the facility." Prior to and on the day of an execution, VDOC faces concerns about internal and external threats that could disrupt the execution as well as maintaining the orderly operation and safety of Greensville, which has over 3,000 inmates and 1,000 staff, and any number of public visitors. In

10

ordering the production of Documents 7a, 7b, 8a-8f, and 9a-9f, the circuit court only stated that VDOC did not provide "a bona fide security concern" for not disclosing the documents. Because we are unable to decipher what weight the circuit court afforded VDOC's expert testimony, we will remand this matter to the circuit court to apply the standard articulated herein to the facts in this record.

3. Redaction of Documents 9a-9f
Current and Prior Execution Manuals

The circuit court ruled that the execution manuals contain security protocols that are exempt from disclosure requirements under the VFOIA. The circuit court then ordered that the records be redacted. VDOC argues on appeal that the circuit court erred in ordering redaction of the current and prior execution manuals to allow for the production of "those pages that relate to and appendices which relate to . . . what happens from the moment the prisoner arrives in [the L-Unit] until the completion of the execution." The question before us is whether an agency is required to redact an exempt document that may contain non-exempt material. We agree with the Commonwealth that an agency is not required to redact under these circumstances.

"'When the language of a statute is unambiguous, we are bound by the plain meaning of that language. Furthermore, we must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity.'" Payne v. Fairfax County Sch. Bd., 288 Va. 432, 436, 764 S.E.2d 40, 43 (2014) (quoting Lucas v. Woody, 287 Va. 354, 360, 756 S.E.2d 447, 449 (2014)).

Code § 2.2-3705.2(6) contains no language that would mandate redaction of the current and prior execution manuals. The plain language of Code § 2.2-3705.2(6) states that it excludes from disclosure

11

> [e]ngineering and architectural drawings, operational, procedural, tactical planning or training manuals, or staff meeting minutes or other records, the disclosure of which would reveal surveillance techniques, personnel deployments, alarm or security systems or technologies, or operational and transportation plans or protocols, to the extent such disclosure would jeopardize the security of any governmental facility, building or structure or the safety of persons using such facility, building or structure.

The section does allow disclosure "by the custodian in his discretion." Code § 2.2-3705.2 (first paragraph).

The wording of the statute applies the exclusion to the entire drawing, manual, minutes or record and makes it disclosable only at the discretion of the custodian. Nothing in this section speaks to redaction except for a general reference to the option of disclosure at the discretion of the custodian. This language creates no requirement of partial disclosure or redaction.

The nature of the exclusion in Code § 2.2-3705.2(6) as a blanket exclusion is supported by a review of other VFOIA statutory provisions. Where the General Assembly intends to require redaction and production of portions of records, it has specifically so provided. The phrases "[t]hose portions" and "portions thereof" appear earlier in the statute in subsections (2), providing for the exclusion of "[t]hose portions" of engineering and construction drawings, and (4), relating to documents pertaining to prevention of terrorist activity (clearly indicating that within those same documents other "portions" are not excluded). Code § 2.2-3705.2. Moreover, subsection (4) includes both phrases "to the extent" and "portions thereof," clearly indicating that the two phrases have different meanings. Code § 2.2-3705.2(4). By contrast, subsection (6), while it also contains the phrase "to the extent," does not include any reference to "portions of" documents fitting an exemption. Code § 2.2-3705.2. Had the General Assembly intended to require redaction of documents that fall under the security exemption of subsection (6) of the statute, it would have included the phrase "those portions" or "portions thereof." The Court

12

cannot read that language into subsection (6). "[C]ourts are not permitted to add language to a statute nor are they permitted to accomplish the same result by judicial interpretation." Shackleford v. Commonwealth, 262 Va. 196, 213, 547 S.E.2d 899, 909 (2001)(internal quotation marks and citations omitted).

Code § 2.2-3705.2(6) excludes the execution manuals from VFOIA disclosure requirements under the security exemption, but does allow disclosure "by the custodian in his discretion." As we have already concluded, VDOC's opinion, as expressed through Robinson as its designee, on whether or not to disclose the documents is entitled to deference. Wolf, 473 F.3d at 374; Gardels, 689 F.2d at 1105. He testified repeatedly regarding the concern that disclosure of the execution manuals could "allow someone to know the specifics about how we manage and operate that unit" and that knowledge could jeopardize the security of the L-Unit.

Surovell's argument that LeMond v. McElroy, 239 Va. 515, 391 S.E.2d 309 (1990), and Moore v. Maroney, 258 Va. 21, 516 S.E.2d 9 (1999), require the Court to affirm the circuit court's order to produce redacted versions of the execution manuals is misplaced. In LeMond, we held that confidential records requested in a VFOIA case are encouraged to be filed with the trial court for *in camera* inspection. When the confidential records are not filed with the trial court and no precise description of the confidential records are given, this Court has an inadequate appellate record and must affirm the ruling of the trial court "without our approval." Id. at 521, 391 S.E.2d at 312. In Moore, the Court applied LeMond and affirmed the trial court's ruling without approving the judgment. The Court held that the judgment could "not be reversed because the responsibility for presenting an adequate appellate record is upon the appellants who seek reversal of the decision below." Moore, 258 Va. at 27, 516 S.E.2d at 13.

13

However, LeMond and Moore clearly state that the documents at issue were neither

submitted nor adequately described to the court. Regarding the settlement agreement at issue in

LeMond, we said

> [w]e do not know whether we are ruling on a one-sentence writing,
> whether we are speaking to a boilerplate general release form,
> whether we are concerned with a detailed, multi-page settlement
> contract, or whether the document is some other kind of official
> record which includes recitals about the merit, or lack of same, of
> the controversy. The parties, by merely stipulating that a
> "settlement agreement" is involved, have done no more than ask us
> for an advisory opinion unsupported by any documentary record
> whatever.

239 Va. at 520, 391 S.E.2d at 312. Similarly, in Moore, we stated that

> [m]oreover, and significantly, we also do not know from the
> factual allegations, or inferences flowing therefrom, the precise
> nature of the records with which we are dealing. They have been
> described in general terms, *i.e.*, "tapes, transcripts, photos and
> reports" as well as "material" generated by surveillance. But we
> do not know, for example, whether the reports and surveillance
> "material" are addressed only to the supervisor of the police
> investigator, in which case they may be purely police records, or
> whether they are addressed to the head of the plumbing inspector's
> department, in which case they may indeed be personnel records.

258 Va. at 26, 516 S.E.2d at 12.

In the present case, by contrast, the record describes the contents of the VDOC's

execution manuals in considerable detail, noting that they contain

> the step-by-step process that has to occur in an execution . . . . the
> very moment that an offender starts the process, in regards to
> completing the selection of the method of execution, and then from
> there to what occurs when they arrive at the facility, and what
> occurs from the time they arrive until the court order is carried out,
> and how we go about that, in regards to who's allowed to come in,
> who's allowed to be part of the execution process.

The record in the present case further documents that the execution manuals also "delineate[] the

process and approximate[] the . . . specific times" for events occurring in that process.

14

Robinson admitted that the execution manuals do not specify precisely when an inmate has to be transferred from Sussex I to the L-Unit, but they do outline the process for the transfer. Robinson also recounted the VDOC concern that disclosure of the execution manuals could "allow someone to know the specifics about how we manage and operate that unit, [and] that they then could take that knowledge, if it was made public, and use it in a way to plan to stop, harm, or kill individuals involved in that process. . . . includ[ing] the offender." The record in the present case – which includes several of the documents submitted under seal and others described in considerable detail – is more than sufficient to have permitted proper consideration by the circuit court, and to afford appropriate appellate review. We agree with the circuit court that the execution manuals contain security protocols that are exempt from VFOIA. Because we hold that VDOC is not required to redact exempt documents, we reverse the judgment of the circuit court to the extent it ordered redaction.

## III. CONCLUSION

For the foregoing reasons, we will reverse the judgment of the circuit court ordering VDOC to produce the requested documents at issue in this case and to redact Documents 9(a)-9(f), and we remand this action for reconsideration of Documents 7(a), 7(b), and 8(a)-8(f) consistent with the holdings in this opinion.

<u>Reversed and remanded.</u>

JUSTICE MIMS, with whom JUSTICE GOODWYN joins, concurring in part and dissenting in part.

I agree with the Court's analysis and conclusions regarding the standard of decision and the weight to be afforded VDOC's determination under Code § 2.2-3705.2(6), and I join in those portions of the opinion. However, I conclude that Code § 2.2-3705.2(6) does not create a

15

"blanket exclusion" for the requested records, and VFOIA therefore requires VDOC to release any non-exempt information contained in the requested records. Consequently, I respectfully dissent from Part II.B.3. of the Court's opinion.

The majority relieves VDOC of the requirement to demonstrate that Code § 2.2-3705.2(6) applies to the requested documents in their entirety on remand. The majority adopts VDOC's position whereby if a requested record contains a single sentence falling under Code § 2.2-3705.2(6), then a public body is authorized to withhold that entire record.

As with all exemptions to VFOIA, we must read Code § 2.2-3705.2(6) in the context of VFOIA's statement of policy, which directs courts to favor disclosure:

> The provisions of this chapter shall be liberally construed to promote an increased awareness by all persons of governmental activities and afford every opportunity to citizens to witness the operations of government. Any exemption from public access to records or meetings shall be narrowly construed and no record shall be withheld or meeting closed to the public unless specifically made exempt pursuant to this chapter or other specific provision of law.

Code § 2.2-3700(B).

Further, we must read Code § 2.2-3705.2(6) in the context of the specific procedures prescribed by the General Assembly for responding to records requests. See Code § 2.2-3704(B). Under Code § 2.2-3704(B), public bodies that receive a records request may either "provide the requested records" or provide one of four enumerated responses. Two of the authorized responses are relevant here:

> 1. The requested records are being entirely withheld because their release is prohibited by law or the custodian has exercised his discretion to withhold the records in accordance with this chapter. . . .
>
> 2. The requested records are being provided in part and are being withheld in part because the release of part of the records is prohibited by law or the custodian has exercised his discretion to

16

> withhold a portion of the records in accordance with this chapter. . . . <u>When a portion of a requested record is withheld, the public body may delete or excise only that portion of the record to which an exemption applies and shall release the remainder of the record</u>.

Code § 2.2-3704(B)(1)-(2) (emphasis added). The final sentence of Code § 2.2-3704(B)(2) clearly contemplates situations in which a single record contains both exempt and non-exempt information. Read together, these provisions permit a custodian to withhold an entire record only when an exemption categorically excludes a record or exempts all of the information contained within a record. When an exemption applies to only some of the information within a record, Code § 2.2-3704(B)(2) permits the custodian to "delete or excise only that portion" and <u>requires</u> the custodian to "release the remainder of the record." Code § 2.2-3704(B)(2) (using the mandatory "shall"); <u>see</u> Virginia Freedom of Information Advisory Council, Advisory Opinion No. AO-13-02 (Oct. 31, 2002), http://foiacouncil.dls.virginia.gov/ops/02/AO_13.htm (last visited June 30, 2015) ("[I]f a record contains both exempt and non-exempt information, the public body may redact only the exempt information and must produce the remainder of the document."). In sum, Code § 2.2-3704(B) makes disclosure the default response. Consistent with VFOIA's statement of policy, a public body may not expand a claimed exemption to withhold information that does not otherwise qualify for exclusion.

In the present case, Code § 2.2-3705.2(6) is one of sixteen listed exemptions relating to public safety and security. <u>See</u> Code § 2.2-3705.2. The introductory clause of Code § 2.2-3705.2 excludes certain records from VFOIA's mandatory disclosure requirements. Even so, the custodian may elect to disclose such records "in his discretion, except where such disclosure is prohibited by law." Code § 2.2-3705.2. The claimed exemption, Code § 2.2-3705.2(6), exempts from mandatory disclosure:

17

> Engineering and architectural drawings, operational, procedural, tactical planning or training manuals, or staff meeting minutes or other records, the disclosure of which would reveal surveillance techniques, personnel deployments, alarm or security systems or technologies, or operational and transportation plans or protocols, to the extent such disclosure would jeopardize the security of any governmental facility, building or structure or the safety of persons using such facility, building or structure.

Nothing in the plain language of this subsection categorically exempts "[e]ngineering and architectural drawings, operational, procedural, tactical planning or training manuals, or staff meeting minutes or other records." Only certain records of this category — "the disclosure of which would reveal surveillance techniques, personnel deployments, alarm or security systems or technologies, or operational and transportation plans or protocols" — are eligible for withholding.

The plain language of Code § 2.2-3705.2(6) focuses the inquiry on "disclosure." The subsection asks whether "disclosure" would reveal sensitive information and jeopardize the security of government facilities or the public safety. Moreover, the limiting phrase "to the extent" limits the exclusion to "disclosure" that would jeopardize the security of government facilities or the public safety. Thus, Code § 2.2-3705.2(6) directs the custodian's attention to the information contained within the records and permits the custodian to withhold sensitive information that — if disclosed — would compromise the objectives of the exemption. In the event that a requested record contains information that would jeopardize security arrangements, but also contains information that does not implicate the objectives of Code § 2.2-3705.2(6), then Code § 2.2-3704(B)(2) requires the custodian to release the non-exempt information and permits the custodian to redact the qualified information.

The use of "[t]hose portions" and "portions thereof" elsewhere in Code § 2.2-3705.2 does not lead to a different conclusion. Specifically, the majority points to subsection (4) wherein both "to the extent" and "portions thereof" appear, and it concludes that the two phrases

18

must have different meanings and that "to the extent" cannot require partial disclosure. However, this conclusion does not account for the context of that subsection. Code § 2.2-3705.2(4) exempts from VFOIA's mandatory disclosure requirements "[p]lans and information to prevent or respond to terrorist activity, the disclosure of which would jeopardize the safety of any person." Code § 2.2-3705.2(4). The first sentence lists specific categories of records eligible for the exemption, divided into three clauses. The phrase "to the extent" appears in clause (iii), concerning "engineering or architectural records," and the phrase limits the exemption available to this category of records, as it does in Code § 2.2-3705.2(6).

On the other hand, the phrase "portions thereof" appears in the second sentence of subsection (4), which provides that a person or entity who submitted a record falling within one of the listed categories to a public body may claim the exemption. To claim the exemption, the person or entity must identify the submitted "records or portions thereof for which protection is sought" and explain why protection is warranted under the exemption. Thus, in this context, the phrase "portions thereof" does not exempt certain sections of a record. Rather, the phrase allows a person or entity to identify a section that the person or entity would like to withhold from disclosure. The public body must still determine whether the exemption applies. If the exemption applies, then the public body may withhold the identified portion "to the extent" that it would reveal sensitive information. If the identified portion includes non-exempt information, then the public body must release the non-exempt remainder of the identified portion. See Code § 2.2-3705.2(4); see also Code § 2.2-3704(B)(2).

The phrase "to the extent" appears throughout Code § 2.2-3705.2, signaling that an exemption is limited or premised on certain conditions. See Webster's Third New International Dictionary 805 (1993) (defining "extent" to mean "the range (as of inclusiveness or application)

19

over which something extends"). Public bodies must use their discretion and apply the listed exemptions "to the extent" that the exemption applies. In this context, we afford VDOC's decision to claim the exemption set forth in Code § 2.2-3705.2(6) due weight, but we should not allow VDOC to expand the exemption to prevent the disclosure of information with no bearing on the objectives of the section.

For these reasons, I believe VFOIA requires public bodies to determine whether an exemption applies to an entire record or only to specific information contained therein. If an exemption applies only to specific information contained therein, then the public body must release the requested record, and it may redact the exempt information in its discretion. In the present case, Code § 2.2-3705.2(6) does not categorically exempt the requested records from VFOIA's mandatory disclosure requirements. Therefore, VDOC must determine whether the requested records contain any non-exempt information and release such information. For these reasons, I would affirm the circuit court's decision to order VDOC to release the execution manuals with exempt information redacted.